# In the United States Court of Federal Claims

|  |  |
|---|---|
| GOVCIO, LLC, *et al.*, | |
| Plaintiffs, | |
| v. | Nos. 25-cv-809, 25-cv-913 |
| THE UNITED STATES, | |
| Defendant, | Filed Under Seal: August 9, 2025[1] |
| and | Publication: August 18, 2025 |
| IRON MOUNTAIN INFORMATION MANAGEMENT, LLC, | |
| Intervenor-Defendant. | |

*James Y. Boland* of Venable LLP, Tysons, VA, argued for Plaintiff GovCIO, LLC. With him on the briefs were *Lindsay M. Reed* of Venable LLP, Washington, D.C., and *Emily R. Marcy* of Venable LLP, Tysons, VA.

*W. Brad English* of Maynard Nexsen PC, Huntsville, AL, argued for Plaintiff 22nd Century Technologies, Inc. With him on the briefs were *Emily J. Chancey*, *Taylor R. Holt*, and *Hunter M. Drake* of Maynard Nexsen PC, Huntsville, AL.

*Vincent D. Phillips, Jr.* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With him on the briefs were *Brett A. Shumate*, *Patricia M. McCarthy*, and *Corinne A. Niosi*, of the United States Department of Justice, Civil Division, Washington, D.C., and *Gregory J. Matherne* of the Office of Chief Counsel, Internal Revenue Service, Washington, D.C.

*Daniel R. Forman* of Crowell & Moring LLP, Washington, D.C., argued for Intervenor-Defendant. With him on the briefs were *Isaac D. Schabes* and *Emily P. Golchini* of Crowell & Moring LLP, Washington, D.C.

---

[1] On August 8, 2025, on consent of the parties, the Court ruled on the record due to the expedited nature of the case. This Memorandum and Order, which was filed under seal on August 9, 2025 in accordance with the Protective Order in this action, is nearly identical to that record ruling, and the relief ordered is identical. ECF No. 6. On August 15, 2025, the parties filed a Notice proposing minor redactions to the opinion. ECF No. 72. The sealed and public versions of this opinion are identical, except for those redactions, this footnote, and the addition of the publication date.

## MEMORANDUM AND ORDER

At issue before the Court are consolidated bid protests by GovCIO and 22nd Century concerning the Internal Revenue Service's award to Iron Mountain of a sole-source bridge contract, known as the Scanning as a Service (SCaaS) task order.[2]  The Agency opted to forgo full competition to make the award, and instead issued this sole-source bridge contract for scanning and digitizing of incoming tax filings and correspondence on the legal basis that an urgent and compelling need existed to complete the work.  To justify this finding, the Agency asserted that a recent Executive Order, mandating electronic tax payments to and from the Government, significantly expedited the Agency's need to scan and digitize incoming taxpayer filings.

The Court does not question the Agency and the Administration's well-reasoned policy judgment regarding the benefits and cost savings of digitalization and the desire to do so expeditiously.  Nor does it conclude that the Agency can never provide adequate justification linking the Executive Order with the goals of the SCaaS task order.  It is well-established, however, that the Court's review is limited to the Agency's justifications contained in the Administrative Record.  In the present Administrative Record before this Court, the Agency failed to provide justification concerning how this Executive Order, aimed at eliminating paper checks to prevent fraud and increase efficiencies, created an urgent and compelling need to award a sole-source bridge contract for scanning incoming tax filings and correspondence, particularly where the Agency had already been working on digitalization and modernization efforts for years.

---

[2] The Court references Plaintiff GovCIO, LLC as "GovCIO," Consolidated Plaintiff 22nd Century Technologies, Inc. as "22nd Century," and GovCIO and 22nd Century collectively as "Plaintiffs." The Court references Defendant, the United States as "Agency" or "IRS," Intervenor Defendant Iron Mountain Information Management, LLC as "Iron Mountain," and the Agency and Iron Mountain collectively as "Defendants."  Further, all references to page numbers within this ruling, other than citations to the Administrative Record (referenced as "AR"), correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

In short, the Agency did not adequately explain how the relevant Executive Order created an urgent and compelling need to sole-source the bridge contract at issue here. Although counsel for Defendants persuasively bridged this gap in their briefing and at oral argument, these asserted rationales are absent from the Agency's justifications in the Administrative Record. While this Court's standard of review is deferential, it cannot defer to an Agency's conclusion that is absent from the record.

As noted below, the Court in its discretion remands this action to the Government, without vacatur, for 30 days to fill in any such gaps. As it is likely that the Agency can provide such a rational justification upon remand, the Court declines to enjoin Iron Mountain's performance of the bridge contract during the remand period; Iron Mountain may continue performing the SCaaS task order scanning and digitization work in the interim. Indeed, to hold otherwise under the particular facts of this case, where the Agency is likely to correct the error quickly, would run counter to the public interest as the cost to the American taxpayer and the disruption to the Agency's digitalization efforts would be profound.

In sum, for the reasons stated below and on the record, Plaintiffs' Cross-Motions for Judgment on the Administrative Record (ECF Nos. 46, 48) are **GRANTED IN PART** and **DENIED IN PART**. Defendants' Cross-Motions for Judgment on the Administrative Record (ECF Nos. 43, 45) are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Motions to Complete the Administrative Record (ECF Nos. 44, 47) and GovCIO's Motion for Leave to Amend its Motion to Complete the Administrative Record (ECF No. 49) are **DENIED AS MOOT**. Finally, GovCIO's Motion for Leave to File a Response to Defendant's Completion of the Administrative Record (ECF No. 67) is **DENIED**. Consistent with this ruling, the Court denies

the Plaintiffs' request to enter an injunction and instead, pursuant to Rule 52.2, **REMANDS** this

action, **WITHOUT VACATUR**, to the IRS for a period of 30 days, or until **September 8, 2025**.

## BACKGROUND

### I.    Pre-Solicitation History

Since 2021, the Agency has been planning for modernization and digitalization.  *See*

AR153–54, AR264–71.   To achieve this goal and to comply with then-recent government

guidance, including from the Office of Management and Budget (OMB), the Agency prepared two

pilot projects: one entitled "SCaaS" and the other "Submission Process Modernization" (SPM).

*Id.*   These pilot programs allowed the Agency to "complete market research for innovative

solutions" and "to evaluate options for digitalization by scanning . . . tax returns then sending

extracted data downstream to [a] Modernized eFile (MeF) system for processing."  AR264.  Iron

Mountain and 22nd Century both participated in the SPM pilot program.  AR153–54; AR257.

GovCIO participated in an early phase of the SCaaS pilot program.  GovCIO Am. Compl. (ECF

No. 40) ¶¶ 29–31.

In 2023, the Agency announced a paperless processing initiative to replace the paper-based

processes that "have long hampered the IRS and frustrated taxpayers."   IRS, *IRS Launches

Paperless Processing Initiative*, Aug. 2023, https://www.irs.gov/newsroom/irs-launches-

paperless-processing-initiative.   As part of the paperless processing initiative, the Agency

explained that by tax filing season 2024, "[t]axpayers will be able to digitally submit all

correspondence, non-tax forms, and responses to notices," and by tax filing season 2025, among

other milestones, the "IRS will digitally process all paper-filed tax and information returns."  *Id.*

On March 25, 2025, President Trump issued an Executive Order entitled "Modernizing

Payments To and From America's Bank Account."  Executive Order No. 14,247, 90 Federal

Register 14,001 (March 25, 2025).  The Executive Order mandated that, with only certain narrow exceptions, by September 30, 2025, the Treasury must cease issuing paper checks and transition to digital payments for all Federal disbursements and receipts, including tax refunds.  *Id.*  Further, the Executive Order's stated purpose included not only deterring the risk of fraud, delays, and inefficiencies, but also the "unnecessary costs" of paper payments, noting that "[m]aintaining the physical infrastructure and specialized technology for digitizing paper records cost the American taxpayer over $657 million in Fiscal Year 2024 alone."  *Id.*

## II.    The Solicitation, Award, and Corrective Action

On April 4, 2025, the Agency issued a Request for Information (RFI) for the SCaaS procurement, with responses due by April 8, 2025.  AR1–36.  The RFI noted that the Agency was "requesting additional information for current market capabilities of scanning as a service (i.e., document conversion and digitization services) providers with the capability to process a significant volume of documentation to assist the IRS in becoming a zero-paper Agency."  AR2. The RFI required that any potential contractor must (1) "have an established solution for scanning documents in place no later than one month after award," (2) be capable of digitizing and transmitting IRS "forms 940, 941, 4868, 7004, 8868 and 1040 with all attachments," and (3) "be an Electronic Return Originator (ERO) for transmitting tax and information returns through MeF and other IRS systems."  AR4–6.

The RFI contained a disclaimer that the RFI responses would only "be used for market research purposes."  AR1.  GovCIO, 22nd Century, Iron Mountain, and several other contractors responded to the RFI.  AR37–119; *see also* AR 37–38 (22nd Century's RFI response); AR52–57 (GovCIO's RFI response); AR58–60 (Iron Mountain's RFI response).  While potential contractors like 22nd Century and Iron Mountain responded that they were EROs capable of digitizing and transmitting the relevant forms, GovCIO responded that it did "not currently transmit tax and

information returns through MeF but will be working to finalize teaming arrangements with a partner that does in advance of this solicitation." AR38, AR53, AR60.

On April 11, 2025, just three days after receiving the RFI responses, Christopher Lucas, an Agency employee, sent an email to Robert Cox, the Agency's Chief Information Security Officer. AR127. The email stated: "For our scanning as a service contract, we will continue to utilize the same vendor and provide a bridge contract to continue service . . . . Would that require an additional cyber review?" *Id.* Mr. Cox responded that continuing with the same vendor—Iron Mountain—would not require additional cyber review. *Id.*

On April 16, 2025, the Agency prepared an acquisition plan, which included in its "Statement of Need," that the Agency was "seeking a Firm-Fixed-Price [] sole source Task Order [] with [Iron Mountain] to continue critical digitalization services impacting taxpayer services, which are currently provided under [contract number] 2032H8-22-C-00022." AR153; *see* AR153–62 (Acquisition Plan). The Acquisition Plan referenced the Agency's apparent mandate to digitize and explained that awarding a contract to Iron Mountain "will allow the IRS to meet their digitalization mandate to replace the manual processing and storing of paper while the IRS works to conduct additional research on the commercial market for these services, including the assessment of new technology." AR153.

The Acquisition Plan explained that "[t]here are two applicable conditions for this acquisition: (1) must be awarded on an aggressive acquisition schedule; and (2) the award must be made to Iron Mountain." AR155. The Agency indicated that it planned to meet these conditions by "[u]tilizing a Limited-Sources Justification (LSJ) in accordance with FAR 8.405-6(a)(1)(i)(B)." *Id.* FAR Subpart 8, under which the SCaaS task order was procured, contains exceptions to the

general rule that procurements must be competitive.  FAR 8.405-2(c)(3)(i)[3]; AR938.  FAR 8.405-6 outlines the circumstances when an agency can invoke these "limiting sources" exceptions and conduct procurements with less than full competition.  FAR 8.405-6.

Two of those exceptions are relevant here.  *See* FAR 8.405-6(a)(1)(i)(A)–(B).  *First*, an exception exists under section (A) where "An urgent and compelling need exists, and following the [FAR's competitive] procedures would result in unacceptable delays."  FAR 8.405-6(a)(1)(i)(A).  *Second*, an exception exists under section (B) where "Only one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized."  FAR 8.405-6(a)(1)(i)(B).  When an agency invokes one of the exceptions under FAR 8.405-6 and the value of the contract exceeds a certain threshold, the agency must issue an LSJ memorandum.  FAR 8.405-6(c).

Here, according to the Acquisition Plan, the Agency planned to support its decision not to competitively procure the SCaaS task order by asserting FAR 8.405-6(a)(1)(i)(B), which applies when "[o]nly one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized."  AR156.  The Agency's conclusion was that only Iron Mountain could meet the requirements of the SCaaS task order.  AR153–55; *see also* AR1656–60 (draft LSJ asserting FAR 8.405-6(a)(1)(i)(B)).

On April 22, 2025, the Agency issued the SCaaS Request for Quotations (RFQ), RFQ No. 2023H2-25-Q-00029, to Iron Mountain only.  AR354–95.  Iron Mountain submitted its response to the SCaaS RFQ on April 27, 2025.  AR1271–1576.

---

[3] The Federal Acquisition Regulation (FAR) is contained in Chapter 48 of the Code of Federal Regulations.  Thus, all references to the FAR are shorthand for "48 C.F.R. §."

Before Iron Mountain had submitted its response to the RFQ, on April 25, 2025, the Agency executed a "Determination to Enter into a Letter Contract for Scanning as a Service" with Iron Mountain.  AR309–11 (Letter Contract Determination); AR1029–32.  "A letter contract is a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services."     FAR 16.603-1.     The Letter Contract Determination referenced FAR 8.405-6(a)(1)(i)(B), that only Iron Mountain could perform the necessary work, and "determined that no other contract is suitable, because (1) the Government's interests demand that the contractor be given a binding commitment so that work can start immediately and (2) negotiating a definitive contract is not possible in sufficient time to meet the requirement."  AR309–10; *see* FAR 16.603-2(a) (establishing these two requirements for when a letter contract may be used).  The Agency also referenced the excessive costs associated with "manual processing of paper submissions," totaling "$1 million per day."  AR309.  The Letter Contract was executed on April 25, 2025, pursuant to FAR 16.603-3, which permits letter contracts only if the "head of the contracting activity or a designee determines in writing that no other contract is suitable."  FAR 16.603-3; AR309–11; AR1029–1032.  The Letter Contract was for a period of one year, with a possible extension option of six months under FAR 52.217-8.  AR309; AR938.

On April 29, 2025, the Agency formally awarded the SCaaS task order, Task Order number 2023H2-25-F-00055, to Iron Mountain for a total potential value of $142,406,958.04 over the twelve-month base period and a six-month option period.  AR937–40 (Award Decision).  The Award Decision noted that Iron Mountain's price was fair and reasonable and that its proposal was technically acceptable.  AR939.  It also recounted the procurement strategy, including that Iron Mountain was selected for the sole source award because it "was the only vendor capable of

successfully scanning all 5 forms within the acceptable quality levels stated above." AR938 (citing FAR 8.405-6(a)(1)[(i)](B)).  The Agency also noted that it was "under an immediate mandate to replace the manual processing and storing of papers," and that "[d]ue to the urgency of this requirement," it proceeded quickly through this procurement.  *Id.*  Therefore, the Agency determined that it was "in the best interest of the Government to fulfill the requirement described in the [Performance Work Statement].  As such, [the task order] award will be made to [Iron Mountain]."  AR939.

On May 12, 2025, GovCIO filed this bid protest.  AR1257; ECF No. 1.  On May 19, 2025, before the Court held the initial status conference in this action, the Agency took corrective action.  ECF No. 24 (Notice of Corrective Action).

The corrective action modified the award from a 12-month base period to a three-month base period with nine one-month options.  *Id.*; AR1124–32; AR1624–25.  The Agency also indicated its intention to "issue a competitive solicitation within the next four weeks" and "make an award decision within three months," which would be by mid-August 2025.  Notice of Corrective Action at 1.

The same day that the Agency took this corrective action, it also filed its LSJ for the modified SCaaS task order.  AR163–73.  Despite indicating in previous documents that it would invoke FAR 8.405-6(a)(1)(i)(B) to justify its sole-source decision on the grounds that only Iron Mountain could accomplish the work, the LSJ instead invoked the exception to competition found in FAR 8.405-6(a)(1)(i)(A), citing an urgent and compelling need such that typical procedures would result in an unacceptable delay.  AR164; *see* AR309–11; AR937–40; AR1029–32.  The LSJ was signed and certified as true by the IRS Program Office, the IRS Contracting Officer, the IRS Bureau Chief Information Officer, the Advocate for Competition, and the Head of the Procuring

Activity. AR166–67. It contains an additional signature page that indicates that the LSJ was prepared by the contracting officer, reviewed by Acting Chief Procurement Officer, and ultimately approved by (1) the IRS Chief Technology Officer, (2) the IRS Acting Chief Operating Officer and Head of Contracting Activity, and (3) the Treasury Acting Deputy Secretary for Acquisition and Senior Procurement Executive. AR168.

Although previous procurement documents had indicated that the Agency planned to invoke FAR 8.405-6(a)(1)(i)(B) to justify its sole-source decision on the grounds that only Iron Mountain could perform the work, the Administrative Record illustrates that even before corrective action in this matter, the Agency generally recognized that it had an urgent need for the work. For example, the Award Decision and Letter Contract mention an urgent need generally, but do not cite FAR 8.405-6(a)(1)(i)(A). AR309; AR938. The Agency's Market Research Summary, which predates the LSJ, states that Iron Mountain is the only source *and* that there is an urgent and compelling need but also does not cite FAR 8.405-6(a)(1)(i)(A). AR260. Indeed, in the email from the agency to Iron Mountain attaching the SCaaS RFQ, the contracting officer noted, "I apologize for the quick turnaround on this RFQ, the IRS is on an extremely short timeline to get an award in place for these services." AR513. While these records reflect an understanding of the need for a short turn around time within the Agency, they do not reflect a rationale as to why the need—which had existed for several years—had suddenly become "urgent and compelling" in nature.

## III.   This Protest and The Digitalization as a Service (DaaS) Solicitation

After the Agency awarded the SCaaS task order to Iron Mountain, GovCIO initiated a bid protest at the Government Accountability Office (GAO). AR1140–1201. In response, the Agency executed an override of the automatic Competition in Contracting Act (CICA) stay. AR1133–46. On May 12, 2025, following a bid protest at the GAO, GovCIO filed the present action. AR1257;

ECF No. 1. Taking into account the parties' availability, the Court promptly scheduled an initial status conference for May 20, 2025. Minute Order, dated May 14, 2025. On May 16, 2025, GovCIO moved for a Preliminary Injunction. ECF No. 21. Then, as noted, on May 19, 2025, the Agency took corrective action.

On May 20, 2025, the Court conducted an Initial Status Conference. During the Conference the Court explained to GovCIO that it could either (i) proceed with its Motion for a Preliminary Injunction followed by motions for judgment on the administrative record, if necessary, in the normal course, or (ii) proceed with expedited briefing on cross-motions for judgment on the administrative record. GovCIO chose to proceed with expedited MJARs. Minute Entry, dated May 20, 2025; ECF Nos. 27, 28. Based on this decision and GovCIO's unavailability for certain argument dates in July, the Court directed the parties to file a Notice "jointly proposing a briefing schedule for any contemplated motions to dismiss, [GovCIO]'s motion for a preliminary injunction, and motions for judgment on the administrative record, along with any related deadlines." ECF No. 27. In its Order, the Court afforded GovCIO another opportunity to pursue its Motion for a Preliminary Injunction, permitting GovCIO to propose a schedule for briefing its Motion for Preliminary Injunction. *Id.* Instead, the parties' Notice "propose[d] expedited briefing on the full merits . . . in lieu of separate briefing on GovCIO's motion for a preliminary injunction." ECF No. 28 at 1. On May 23, 2025, the Court issued an order adopting the parties' proposed briefing schedule and denied GovCIO's Motion for A Preliminary Injunction as moot. ECF No. 29.

On May 29, 2025, 22nd Century initiated a separate bid protest. Case No. 25-913, ECF No. 1. In light of 22nd Century's protest, on June 3, 2025, GovCIO filed an Unopposed Motion to Amend the Schedule. ECF No. 31. On June 4, 2025, the Court held a combined Joint Status

Conference in both cases. Following the Conference, the Court consolidated both bid protests on consent of the parties, designated GovCIO as the lead case, and issued a Revised Scheduling Order setting the current briefing schedule for the consolidated action. ECF Nos. 32, 33.

After the consolidation of the two protests, which concern the bridge contract at issue, the Agency informed the Court that the Agency had issued a related, competitive solicitation on or about June 17, 2025 to meet the same needs as the SCaaS task order. ECF No. 42. The competitive solicitation, Digitalization-as-a-Service (DaaS), closed on July 16, 2025. Agency Reply MJAR (ECF No. 58) at 4.

At oral argument on July 23, 2025, counsel for the Agency explained that the Agency had received proposals for the DaaS solicitation and further informed the Court that the Agency was in the process of evaluating those proposals. Transcript, dated July 23, 2025 (ECF No. 64) (Tr.) at 6:24–7:6. At present, there is no date certain as to when the Agency will award the DaaS task order, but the original notice of corrective action estimated that the award would be made by mid to late August. *Id.*; Notice of Corrective Action.

At oral argument, the Agency also informed the Court that it had exercised the first one-month option period on the SCaaS task order with Iron Mountain to continue providing the Agency with bridge coverage until the DaaS task order is awarded. Tr. at 7:7–18. Further, the Agency has explained that it plans to cancel the SCaaS task order once the DaaS task order is awarded and performance begins. Tr. at 8:12–24; Agency Reply MJAR at 4–5. Once the SCaaS task order is canceled, the Plaintiffs agree that this protest will be rendered moot. Tr. at 28:8–12. Thus, the SCaaS task order—a bridge contract—will likely be canceled soon after the DaaS task order is awarded.

## APPLICABLE LEGAL STANDARDS

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, provides this Court with jurisdiction over bid protests.  Bid protests proceed in two steps.  *First*, the Court determines whether, under the Administrative Procedure Act (APA) standard, the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024).  *Second*, the Court considers whether the alleged errors prejudiced the protestor.  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351).

At step one, the Court reviews the procurement under the standards set forth in the APA. *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021); 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  The APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Thus, to prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' *or* (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)); *see*

*also Palantir USG, Inc. v. United States*, 904 F.3d 980, 994 (Fed. Cir. 2018) ("For agency action to be upheld, it must not only be explainable; it must also be explained." (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 660–61 (D.C. Cir. 1983))). As the United States Court of Appeals for the Federal Circuit has explained, when a protest challenges whether a decision has a rational basis, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)). Consistent with this heavy burden, agency decisions are "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)). Further, "[a]gencies are entitled to a high degree of deference when faced with challenges to procurement decisions." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1351 (Fed. Cir. 2013).

In sum, courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Indeed, so long as "the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). Put differently, this Court will not substitute its judgment for that of the agency. *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 786 (2022) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20 (1971)).

At step two, this Court evaluates prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997–98 (Fed. Cir. 2021). Thus, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *DynCorp Int'l*, 10 F.4th at 1308

(quoting *WellPoint Mil.*, 953 F.3d at 1377). A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). In other words, the disappointed bidder must have been "within the zone of active consideration." *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." Rule 52.1(c) of the Rules of the United States Court of Federal Claims; *Bannum*, 404 F.3d at 1356. Unlike at summary judgment, genuine disputes of material fact do not preclude a court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357. This Court is also empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375 (quoting 28 U.S.C. § 1491(b)(2)). To that end, if necessary, this Court may remand the case back to a governmental agency for further factual finding. Rule 52.2.

## DISCUSSION

### I.    Standing

The Defendants advance two standing-related arguments. *First*, Iron Mountain argues that both Plaintiffs lack Article III standing. Iron Mountain MJAR (ECF No. 45) at 22–28. *Second*, both Defendants argue that both Plaintiffs lack statutory standing. *Id.* at 28–33; Agency MJAR (ECF No. 43) at 25–35. The Court holds that Plaintiffs can establish both Article III standing and statutory standing under Section 1491(b). Each argument is addressed below.

A.    **Article III Standing**

Article III standing is a threshold jurisdictional question in the United States Court of Federal Claims. *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1317 (Fed. Cir. 2025). "The party invoking federal jurisdiction bears the burden of establishing the elements of standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018). To establish Article III standing, "a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 599 U.S. 670, 676 (2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019))).

Iron Mountain advances two separate standing arguments.

*First*, Iron Mountain contends that both Plaintiffs have received their requested relief: a competitive procurement. Iron Mountain MJAR at 22–25. Iron Mountain asserts that the DaaS procurement has "eliminated the possibility of meaningful relief," and therefore there is no redressable injury. Iron Mountain Reply MJAR (ECF No. 60) at 7 (citing *McTech Corp. v. United States*, 105 Fed. Cl. 726, 731 (2012) (emphasis omitted)); *see* Iron Mountain MJAR at 25 (first citing GovCIO Am. Compl. at 43; and then citing 22nd Century Am. Compl. (ECF No. 41) at 24). This argument fails because (1) Iron Mountain continues to perform under the SCaaS task order, which the Agency has not canceled, and (2) both GovCIO and 22nd Century seek to enjoin performance of the SCaaS task order. GovCIO Am. Compl. at 43; 22nd Century Am. Compl. at 24. Indeed, if the Agency exercises all options, Iron Mountain could perform under the SCaaS task order through October 24, 2026. *See* AR1124. Plaintiffs meaningfully contend that they have lost and continue to lose the opportunity to perform under the SCaaS task order. The Court could

redress these alleged injuries by enjoining the award.  Therefore, Plaintiffs have demonstrated that they have an injury that this Court may redress with a favorable decision, which satisfies the Article III requirements of standing.  *Texas*, 599 U.S. at 676.  To be sure, this action will remain a live controversy until the SCaaS task order is canceled by the Agency or enjoined by this Court.  Tr. at 28:7–12 (reflecting Plaintiffs' attorneys' agreement that this protest would be moot if the Agency cancels the SCaaS task order).

*Second*, Iron Mountain argues that 22nd Century lacks Article III standing because it has not suffered an injury-in-fact and instead seeks to use this protest to litigate a "wholly speculative harm stemming from an evaluation [in the DaaS procurement] that has not yet occurred."  Iron Mountain MJAR at 25–28.  This argument appears to be based on statements made by 22nd Century at the June 4, 2025 Status Conference, during which 22nd Century explained that its "biggest concern is the justification or the determination and findings."  22nd Century also noted that it originally was not "planning on protesting [the SCaaS task order] until [it] saw some of the findings specifically about [22nd Century] that [it] think[s] just are not true."  *22nd Century Techs. v. United States*, Case No. 25-913 (Fed. Cl. 2025), ECF No. 21, Transcript, dated June 4, 2025, at 8:9–17 (Status Conference Transcript).  Based on these statements, Iron Mountain asserts that 22nd Century is not truly challenging the Agency's findings as to the SCaaS procurement but rather is challenging Agency's determinations because it believes the findings may carry over into the DaaS procurement.  Iron Mountain MJAR at 26–27 (first citing 22nd Century Am. Compl. ¶¶ 34–56; and then quoting Status Conference Transcript at 8:9–10:3).  Iron Mountain is correct that this Court cannot provide prospective relief based on alleged harms arising out of a future contract.  *Lujan*, 504 U.S. at 564 (finding speculation about future harm insufficient to establish standing).  However, that is not what 22nd Century seeks here via its MJAR, regardless of counsel's

17

statements made at the June 4, 2025 Status Conference. The Court concludes that 22nd Century has standing because its Complaint and MJAR briefing plainly demonstrate that it is protesting findings that underlie the SCaaS task order and nothing else. *See* 22nd Century Am. Compl. ¶¶ 45–51. Regardless of any strategic or business reason for protesting—such as the concerns 22nd Century noted at the June 4, 2025 Status Conference—its filings in this action before this Court demonstrate that 22nd Century is challenging the current SCaaS Task Order, and not improperly protesting a future task order. *Id.*; 22nd Century Responsive MJAR (ECF No. 52) at 8.

Accordingly, for the reasons stated above, the Court holds that both Plaintiffs have Article III standing.

### B.    Statutory Standing under Section 1491(b)(1)

Unlike Article III standing, statutory standing under 28 U.S.C. § 1491(b)(1) is not jurisdictional. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151–55 (Fed. Cir. 2023). To establish statutory standing under 28 U.S.C. § 1491(b)(1), a plaintiff must demonstrate that they (i) are an "interested party," and (ii) were prejudiced by a significant error in the procurement process. *Associated Energy Grp.*, 131 F.4th at 1319; *CliniComp*, 904 F.3d at 1358. An interested party is "'an actual or prospective bidder' [that] has a 'direct economic interest' in the procurement or proposed procurement." *CliniComp*, 904 F.3d at 1358 (quoting *Diaz v. United* States, 853 F.3d 1355, 1358 (Fed. Cir. 2017)). "[T]o prove a direct economic interest, a party must show that it had a substantial chance of winning the contract." *Id.* (quoting *Diaz*, 853 F.3d at 1358). Put another way, "[t]o establish statutory standing, and demonstrate it is an 'interested party' and sustained prejudice, [a plaintiff] must show at least a substantial chance it would have been a prevailing bidder under the Solicitation had it not been for the errors it contends plagued the procurement process." *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024).

Defendants advance two statutory standing arguments. *First*, Defendants contend that since GovCIO acknowledges that it could not meet the requirements of the RFI—and thus the SCaaS task order—it lacks statutory standing to challenge the award because it has not established that it would have been able to bid had the Agency made the process competitive. Agency MJAR at 25–26 (citing *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)); Iron Mountain MJAR at 31–33; Agency Reply MJAR at 9–10. Specifically, GovCIO's RFI Response explained that at that time it was not an ERO capable of transmitting tax returns through the MeF and other IRS systems as required by the SCaaS RFQ. Agency MJAR at 25–26 (first quoting AR169; and then citing GovCIO Am. Compl. ¶¶ 15, 67–68, 74, 76–77); Iron Mountain MJAR at 28–33 (citing AR36); *see also* AR53.

The Court finds that GovCIO is an interested party regardless of its response to the RFI and statements in its Amended Complaint here. To begin, the proper inquiry for the Court is whether GovCIO could have competed for the award if the bid process had been competitive. *Myers Investigative*, 275 F.3d at 1370 (quoting *Impresa*, 238 F.3d at 1334). Unlike in *Myers*, where the plaintiff "presented no evidence that it was qualified to secure the awards if they had been made the subject of competitive bids," *id.* at 1371, GovCIO here presents ample evidence that it could have reactivated its ERO status and would have found a teaming partner, GovCIO Am. Compl. ¶¶ 15, 71, 74, 76, 193; GovCIO Responsive MJAR (ECF No. 55) at 11–16 (citing GovCIO Responsive MJAR, Ex. A (Third ███ Decl.) ¶ 3). Although the Agency argues that GovCIO could not have reactivated its ERO status or found a teaming partner in time, that argument is speculative. Agency MJAR at 26. Indeed, since submitting its RFI response, GovCIO has already found a teaming partner and reactivated its ERO status. GovCIO Responsive MJAR at 16 (citing Third ███ Decl.¶ 3). Taking the record and the parties' briefing and declarations

as a whole, these facts are sufficient to meet the low bar that the protestor's chance of award "must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

*Second*, the Agency argues that neither Plaintiff can establish prejudice because neither could perform the requirements of the SCaaS task order when the Agency issued the sole source award. Agency MJAR at 34–35. A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). For the reasons previously explained, the Court finds that it is likely that GovCIO and 22nd Century could have bid on a competitive SCaaS solicitation. Accordingly, both Plaintiffs meet the low bar of showing that they "had greater than an insubstantial chance of securing the contract" but for the alleged error. *REV, LLC*, 91 F.4th at 1163 (quoting *Info. Techs. & Applications Corp.*, 316 F.3d at 1319).

## II.    The Agency's Limited Sources Justification (LSJ)

For the reasons described below, the Court holds that the Agency's Limited Sources Justification (LSJ) failed to adequately explain why the cited Executive Order created an urgent and compelling need such that it could not compete the SCaaS contract. Accordingly, the Court will remand to the Agency, without vacatur, for a period of up to 30 days for the Agency to either provide (1) a more fulsome explanation of the Agency's reasoning at the time of the agency action, or (2) render a new agency decision regarding its justification to limit competition of the SCaaS task order based on FAR 8.405-6.

CICA requires agencies to utilize competitive procedures and obtain full and open competition. 41 U.S.C. § 3301(a). CICA provides certain exceptions for non-competitive procedures, such as when "the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is

permitted to limit the number of sources from which it solicits bids or proposals." 41 U.S.C. § 3304(a)(2).

As previously explained, FAR 8.405-6 provides exceptions to the general rule that all procurements must be competitively bid. The "limiting sources" exceptions in FAR 8.405-6 outline the circumstances when an agency can conduct procurements with less than full competition, such as the award of a sole-source contract. FAR 8.405-6. Two of these limiting sources exceptions are relevant here. *See* FAR 8.405-6(a)(1)(i)(A)–(B). First, under section "(A) An urgent and compelling need exists, and following the procedures would result in unacceptable delays." FAR 8.405-6(a)(1)(i)(A). Second, under Section "(B) Only one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized." FAR 8.405-6(a)(1)(i)(B). When an agency invokes one of the exceptions under FAR 8.405-6(a)(1)(i) and the value of the contract exceeds a certain threshold, it must publish a notice in accordance with FAR 5.301 on sam.gov and the agency's website for at least 30 days. FAR 8.405-6(a)(2)(i)(A)–(B). This notice—the LSJ or Limited Sources Justification—must contain the specific information included in FAR 8.405-6(c).

Here, the Agency issued its LSJ on May 19, 2025, justifying its sole-source award to Iron Mountain. AR163–73. The LSJ requires the Agency provide an "[i]dentification of the authority being used." AR164. The Agency selected FAR 8.405-6(a)(1)(i)(A), that "[a]n urgent and compelling need exists, and following the procedures would result in unacceptable delays." *Id.* The Agency did not select the other box under FAR 8.405-6(a)(1)(i)(B), that "[o]nly one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized." *Id.*

Both GovCIO and 22nd Century agree that the LSJ meets the minimum procedural requirements; instead, they only challenge whether the Agency's conclusion, that an urgent and compelling need existed, was rational. Tr. at 51:9–52:13; 65:15–23. Thus, as both Plaintiffs acknowledged at oral argument, the narrow issue before the Court here is whether the Agency's justification included in its LSJ that there was an urgent and compelling need under FAR 8.405-6(a)(1)(i)(A) has a rational basis in the record. Tr. at 53:5–54:7; 65:21–23. As such, Plaintiffs' arguments are irrelevant to the extent they relate to issues other than whether the LSJ provides a rational basis for its conclusion that there is an urgent and compelling need.

As noted, the Court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys.*, 906 F.3d at 992 (quoting *Banknote Corp.*, 365 F.3d at 1351). This Court cannot substitute its judgment for the Agency's, even if it would have reached a different result in the first instance. *Overton Park*, 401 U.S. at 416–20; *Weeks Marine*, 575 F.3d at 1371 (quoting *Honeywell*, 870 F.2d at 648).

FAR 8.405-6(c)(2)(xi) requires that the Agency post "a written determination by the approving official identifying the circumstance that applies." In its LSJ, the Agency asserted that, pursuant to FAR 8.405-6(a)(1)(i)(A), "[a]n urgent need exists, and following the procedures would result in unacceptable delays." AR164. As noted, the LSJ, signed on May 19, 2025, was signed and certified as true by the IRS Program Office, the IRS Contracting Officer, the IRS Bureau Chief Information Officer, the Advocate for Competition, and the Head of the Procuring Activity. AR166–67. It contains an additional signature page that indicates that the LSJ was prepared by the contracting officer, reviewed by Acting Chief Procurement Officer, and ultimately approved by (1) the IRS Chief Technology Officer, (2) the IRS Acting Chief Operating Officer and Head of Contracting Activity, and (3) the Treasury Acting Deputy Secretary for Acquisition and Senior

Procurement Executive.  AR168.  Consistent with the Plaintiffs' agreement that the LSJ was not procedurally improper, the Court understands that the Agency received all relevant approvals for its final justification in its LSJ that an urgent and compelling need exists.  *Id.*; Tr. at 51:9–52:14; 65:17–23.

Accordingly, the Court now turns to key question: whether the LSJ provides a rational basis for the Agency's conclusion that an urgent and compelling need exists.  The Court finds it does not.  Although the LSJ contained some reasoning, it lacked one critical explanation: how Executive Order 14,247 specifically created the urgent and compelling need upon which the Agency relies for this particular procurement.

Executive Order 14,247 provides that, by September 30, 2025, the Treasury must cease issuing paper checks and transition to digital payments for all Federal disbursements and receipts, including tax refunds.  The Agency argues that this Executive Order "changed the landscape underneath" the Agency and "accelerate[d] [the] timeline" of an already ongoing digitalization project.  Tr. at 88:19–22, 90:6–8.  Iron Mountain similarly contends that the Executive Order created this urgency.  *See* Tr. at 112:20–113:7.  However, as even the Agency acknowledged at oral argument, the Executive Order speaks to "the phaseout of paper check disbursement," by the IRS, rather than the digitizing of incoming tax filings and correspondence contemplated by the SCaaS task order.  Tr. at 88:23–89:4.

Indeed, the plain language of the Executive Order reflects that it is aimed at digitizing *payments* to and from the Treasury.  Executive Order 14,247.  Nothing in the LSJ explains how this Executive Order about digital payments is connected to or created an urgent and compelling need for the Agency to award a contract for digitizing incoming tax forms and correspondence. At a high level, the LSJ explains that moving towards zero paper and increased digitalization are

"a priority of the Department of the Treasury and the Administration."  AR165.  The Court does not question that well-reasoned policy decision.  Plainly, the Executive Order contains a mandate for the Department of the Treasury to digitize payments.  However, the LSJ fails to explain how this mandate regarding digitizing payments to and from the Government lead the Agency to conclude that the SCaaS task order must also be quickly awarded as a result.

Further, before the Executive Order was issued, the Agency had already announced its plans for digitalization, taken substantial steps towards digitization through the pilot programs, and operated under a 2019 OMB mandate to digitalize.  AR153–54; AR163 (citing OMB Memo M-19-21, National Archives and Records Administration 2022 mandate (June 28, 2019)); AR257; AR264–71; *IRS Launches Paperless Processing Initiative*.  The LSJ's discussion of Executive Order 14,247 also fails to explain why the Agency understood that an Executive Order about electronic payments was applicable to the SCaaS task order and how that understanding led it to the conclusion that an urgent and compelling need existed.  AR164–65.

Without an explanation as to why the Executive Order changed the landscape—beyond generic references to administration priorities or mandates—the Court cannot say that the Agency's conclusion that an urgent and compelling need exists is rational.  Put differently, the Agency needed to have explained how the Executive Order "accelerate[d] [the] timeline" and "changed the landscape underneath" the Agency.  *See* Tr. at 88:19–22, 90:6–8.  Otherwise, the LSJ shows no other appreciable changes to the status quo that would justify an urgent and compelling need.  With the addition of this explanation, the Court would easily conclude that an urgent and compelling need existed based on the other reasons listed in the LSJ, such as advanced planning that went into the pilot programs, issues and inefficiencies associated with the manual

processing of paper submission, cost savings associated with digitalization, and the potential backlog if scanning service was interrupted. AR163–65.

In their MJAR briefing and at oral argument, Defendants' counsel offered explanations why the Agency understood that the Executive Order implicated the SCaaS task order. For example, at oral argument, Iron Mountain asserted that, based on the timing of the Executive Order and the RFI, "it's pretty clear that the IRS understood the EO to require digitalization and that the IRS believed you couldn't simply digitize the returns without digitizing the incoming papers." Tr. at 112:20–113:7. If true, this would properly bridge the current gap in the record regarding how the Executive Order created the present urgent need. This reasoning, however, does not appear in the record. It is absent from the LSJ. So, no matter how compelling this attorney explanation may be, it is inadequate to support the Agency's conclusion here because it is not the *Agency's* reasoning as set forth on the face of the LSJ. *CAN Softtech, Inc. v. United States*, --- Fed. Cl. ----, 2025 WL 2154654, at *15 (Fed. Cl. July 17, 2025) (noting that while points made in attorney argument "very well may be true, . . . the Agency must provide a clearer explanation (indeed, any explanation) of that fact to satisfy APA arbitrary-and-capricious review"). Indeed, although this Court's standard of review is deferential, it cannot defer to an Agency's conclusion that does not exist in the record. *Overton Park*, 401 U.S. at 416–20; *Sys. Stud. & Simulation*, 22 F.4th at 997 (explaining that the key question is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion" (quoting *Impresa*, 238 F.3d at 1333)).

An agency must explain its own decision; here, that means the Agency must explain in the first instance how it understood the Executive Order and how that understanding connects digitization of incoming tax documents and correspondence to an Executive Order about digitizing

payments. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983); *Sys. Stud. & Simulation*, 22 F.4th at 997 (quoting *Impresa*, 238 F.3d at 1333).

In sum, the Agency asserts that the Executive Order created the urgency that led to the LSJ, but the LSJ itself fails to explain—beyond reference to a generic "mandate"—why the Agency understood the Executive Order as creating such an urgency that the Agency had to forego competition in the short term. Indeed, as 22nd Century noted at oral argument, the Court may not "give greater credit and deference to the things the [Agency] didn't say." Tr. at 126:7–10.

The Court's conclusion is narrow. The Court holds that the LSJ, as currently written, does not adequately link the Executive Order's direction to digitize payments to this task order for digitizing incoming tax documents. To be clear, the Court does not hold that no urgent and compelling need exists and does not address whether a justification under FAR 8.405-6(a)(1)(i)(B), that only one source is capable of performing the work, would have been sufficient. Indeed, the Court is convinced by counsel's arguments that an urgent and compelling need likely exists due to the Executive Order; unfortunately for Defendants, their counsel's arguments are not reflected in the record itself. Binding precedent mandates that the record itself reflect such a rational justification. *Overton Park*, 401 U.S. at 416–20; *Sys. Stud. & Simulation*, 22 F.4th at 997 (quoting *Impresa*, 238 F.3d at 1333).

## III.    Remand Without Vacatur

The Court concludes that the appropriate remedy is a remand to the Agency, without vacatur, "for additional investigation or explanation" regarding its LSJ. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Accordingly, the Court will order a remand for a period of thirty days.

"[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy" in bid protest cases. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir.

2011).  Indeed, the Tucker Act empowers this Court to "award *any* relief that [it] considers proper." 28 U.S.C. § 1491(b)(2) (emphasis added).  "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power*, 470 U.S. at 744; *see Food & Drug Admin. v. Wages & White Lion Invest., L.L.C.*, 604 U.S. ----, 145 S. Ct. 898, 928 (2025).  This Court's Rules, too, expressly permit remand.  Pursuant to Rule 52.2(a), "In any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official."  Rule 52.2(a); *see also IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 412 (2021) (citing Rule 52.2(a)).

Accordingly, the Court declines to issue a permanent injunction.  "[A]n injunction is generally not appropriate when a less drastic remedy is available."  *IAP World Servs.*, 152 Fed. Cl. at 397 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) ("If a less drastic remedy . . . was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.")).  Instead, remand without vacatur is appropriate here because "there is a reasonable possibility that the government can justify its decision" on remand.  *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 85 (2022); *see also Nat'l Org. of Veterans' Advocs. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (finding remand without vacatur appropriate where "[i]t may be that the agency can provide a reasonable explanation for its decision" on remand, "[b]ut it has not yet done so").  Further, "[o]n this record, the Court concludes it may be possible for [the agency] to articulate a reasonable

explanation that rationally connects its findings . . . to its [] decision, so remand is appropriate." *CAN Softtech*, 2025 WL 2154654, at *17 (remanding without vacatur).

Additionally, Plaintiffs' injuries can be redressed by requiring the Agency to reevaluate its justification for limiting competition for the SCaaS task order on remand. Accordingly, the Court finds that this less drastic remedy is more appropriate than an injunction. *Monsanto Co.*, 561 U.S. at 165–66; *IAP World Servs.*, 152 Fed. Cl. at 397. Indeed, to enjoin the Agency from continuing performance of the SCaaS task order would produce the same practical effect as a remand— requiring the Agency to reconsider its decision to limit sources and provide a rational explanation in an LSJ if it does—but with a critical break in service for the Agency that would impose great expense on the American taxpayer. AR165 (noting that "delay of these critical services would result in a cost of at least $173,000 per day, or $63.2 million per year, to the American taxpayers"). Following an injunction, the Agency would likely follow the same steps that the Court has laid out above: reconsidering whether a limiting sources exception exists under FAR 8.405-6(a) and, if so, issuing a sole source award and an LSJ explaining its reasoning. Those steps, however, would redirect Agency resources from the competitive DaaS procurement, which ultimately would not further the Plaintiffs' interest in a quick and thorough competitive process for the DaaS procurement. *See* Tr. at 142:19–143:10 (Government counsel explaining that many quotes were submitted in the DaaS procurement, "assets are being marshaled to reviewing" those submissions, and the same personnel responsible for that review would be responsible for implementing any order from this Court). As a 30-day remand will provide the same relief to Plaintiffs and as such a review can be completed expeditiously, the balance of the equities favor a brief remand without vacatur. *CAN Softtech*, 2025 WL 2154654, at *17 (citations omitted). Accordingly, a remand

without vacatur is the less drastic remedy and is appropriate here. *See Monsanto Co.*, 561 U.S. at 165–66; *Fla. Power*, 470 U.S. at 744.

As noted above, the Agency failed to provide adequate reasoning to support the conclusion in its LSJ that there was an urgent and compelling need such that following procedures would result in unacceptable delays. Accordingly, this procurement is remanded to the Agency "for additional investigation or explanation." *Fla. Power*, 470 U.S. at 744. On remand, the Agency may do one of two things. "First, the agency can offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)). Second, "the agency can 'deal with the problem afresh' by taking new agency action." *Id.* at 21 (quoting *Sec. & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).

Specifically, the Court directs the Agency on remand to do the following:

(1)    Reconsider whether any of the exceptions for limiting competition under FAR 8.405-6(a) are still applicable to the SCaaS task order.

(2)    To the extent the Agency determines that any of the exceptions, including urgent and compelling need, still apply, the Agency shall either amend its current LSJ to provide a more fulsome explanation of the Agency's existing rationale or it may take new action, such as issuing a new task order or new LSJ providing a rational explanation as to the chosen limited sources exception. The Agency must fully explain in the LSJ how any factors driving its decision support its chosen justification or action, so that the Court may fully assess whether the Agency's conclusion is rationally supported by the record.

29

(3)    If the Agency makes another non-competitive award subject to FAR 8.405-6(a), the Agency must explain why it selected its chosen contractor for that award. *See* Tr. at 109:2–15; 114:14–23.  If the Agency bases its contractor selection on comparators between multiple contractors, such as whether certain contractors are the *only* one who can do work or another potential contractor is *unable* to adequately perform, it must include specific evidence in the record to support the conclusions drawn.  The Court expresses no opinion as to whether the Agency should or should not apply such a comparative analysis; the Court simply advises the Agency that, should it choose to conduct such an analysis, the Agency must provide an adequate explanation, based on record evidence, to support its conclusion.

(4)    The Agency shall ensure that any necessary approvals of the procurement are made subject to the post-remand justification contained in the LSJ.

## IV.    Outstanding Motions

Still outstanding before the Court are the Plaintiffs' Motions to Complete the Administrative Record, ECF Nos. 44, 47, GovCIO's Motion to Amend its Motion to Complete the Administrative Record, ECF No. 49, and GovCIO's Motion for Leave to File a Response to Defendant's Completion of the Administrative Record, ECF No. 67.

*First*, the Court denies as moot Plaintiffs' Motions to Complete the Administrative Record and GovCIO's Motion to Amend its Motion to Complete the Administrative Record.  ECF Nos. 44, 47, 49.  As noted, the only issue before the Court is whether the LSJ contained sufficient support for the Agency's conclusion that an urgent and compelling need existed.  Thus, because the documents with which the Plaintiffs sought to complete the record relate to other, non-relevant issues that the Court need not address in light of its ruling today, the Court denies these Motions as Moot.

*Second*, the Court denies GovCIO's Motion for Leave to File a Response to Defendant's Completion of the Administrative Record.  ECF No. 67 (Motion for Leave or Mot.).  This Motion, filed in response to the Agency's completion of the administrative record, which the Court notes was based on the consent of all parties during oral argument, requests leave to file a response to the corrected administrative record.  Mot. at 3; Tr. at 123:1–22.  The response GovCIO seeks leave to file is incorporated into its Motion for Leave to File.  Mot. at 8.  GovCIO contends that it did not have an opportunity to comment on the new additions to the Administrative Record filed on August 1, 2025, after oral argument.  At bottom, GovCIO's Motion is simply a disguised surreply in support of its Motion for Judgment on the Administrative Record.

The court has discretion to grant or deny leave to file a surreply.  *Revitalizing Auto Cmtys. Env't Resp. Tr. v. United States*, 170 Fed. Cl. 279, 295 (2024); *Lodge Constr., Inc. v. United States*, 153 Fed. Cl. 430, 433 (2021) (quoting *Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. United States*, 145 Fed. Cl. 609, 617 n.6 (2019)).  "The 'standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply.'"  *Revitalizing Auto Cmtys.*, 170 Fed. Cl. at 295 (quoting *Ute Indian Tribe*, 145 Fed. Cl. at 617 n.6).  Courts should consider "whether the surreply is helpful to the adjudication of the motion and whether the defendant will be unduly prejudiced if the court grants leave.  *Ute Indian Tribe*, 145 Fed. Cl. at 617 n.6 (citing *Plunkett v. Dep't of Just.*, 249 F. Supp. 3d 73, 74 n.2 (D.D.C. 2017)).  However, "[a] surreply is improper when it serves as nothing more than 'an effort to get the last word.'"  *Revitalizing Auto Cmtys.*, 170 Fed. Cl. at 295 (quoting *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 431 (2015)).

The Court declines to grant GovCIO leave to file a surreply styled as response to the completion of the Administrative Record.  To begin, the record was completed on consent of the

parties.  Tr. at 123:1–22.  Further, as a general matter, GovCIO's arguments regarding the change in the Agency's justification could have been raised before the new documents were added to the Administrative Record.  Certainly, GovCIO could not have specifically cited any newly added documents, but it could have raised the argument that the Agency switched the rationales contained in early procurement documents to the final LSJ.  Regardless, the arguments advanced by GovCIO do not aid in the Court's adjudication of the merits because the newly added documents, such as AR1656, do not change the Court's analysis of the narrow issue before the Court.

Further, the latter half of GovCIO's motion is dedicated to whether a remand or injunction is more appropriate.  Mot. at 4–8.  However, GovCIO has already submitted its arguments on why it believes an injunction is proper and none of the newly added documents to the Administrative Record affect the legal standards for whether an injunction or remand is more appropriate.  This portion of GovCIO's Motion is not responsive to the newly added documents in the Administrative Record, but instead is responsive to arguments raised at Oral Argument.  Accordingly, GovCIO is not entitled to provide additional views on this issue, which has already been exhaustingly briefed.

## **CONCLUSION**

For the reasons stated above, Plaintiffs' Cross-Motions for Judgment on the Administrative Record (ECF Nos. 46, 48) are **GRANTED IN PART** and **DENIED IN PART**.  Defendants' Cross-Motions for Judgment on the Administrative Record (ECF Nos. 43, 45) are **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' Motions to Complete the Administrative Record (ECF Nos. 44, 47) and GovCIO's Motion for Leave to Amend its Motion to Complete the Administrative Record (ECF No. 49) are **DENIED AS MOOT**.  Finally, GovCIO's Motion for Leave to File a Response to Defendant's Completion of the Administrative Record (ECF No. 67) is **DENIED**.

Accordingly, the Court **ORDERS** the following:

(1)     Pursuant to Rule 52.2, this case is **REMANDED**, **WITHOUT VACATUR**, to the to the Internal Revenue Service (IRS or Agency) for a period of 30 days,[4] or until **September 8, 2025**.  On remand, the Agency shall, consistent with this ruling, either provide (1) a fulsome explanation of the Agency's reasoning at the time of the agency action, or (2) render a new agency decision regarding its justification to limit competition of the SCaaS task order based on FAR 8.405-6.

(2)     The Court orders the Government to provide a copy of this Court's Order, which shall constitute service pursuant to Rule 52.2(b)(2), to the Agency.  The Government shall file a Notice with the Court by **August 15, 2025**, certifying that it has sent a copy of this Order to the appropriate officials at the Agency;

(3)     Upon completion of the Agency's reevaluation, the Government shall notify the parties of the results and share decisional documents with counsel for all parties. The parties shall then confer and file a Joint Status Report advising the Court of what, if any, further proceedings are necessary.  This Joint Status Report shall be filed within 10 days of the notice of the remand analysis or by **September 18, 2025**, whichever is earlier; and

(4)     This case shall be **STAYED** during the remand until the parties file the above-referenced Joint Status Report.

(5)     The parties are directed to **CONFER** and **FILE** a Notice by **August 15, 2025**, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

Washington, D.C.
August 8, 2025

---

[4] The Court calculates this date from the August 8, 2025 ruling on the record.